## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEPHANIE SCHOTT MOROS** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 12-5468** |
| **v.** | : | |
| | : | |
| **CONNECTICUT GENERAL LIFE** | : | |
| **INSURANCE CO.** | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                     JANUARY 28, 2014

## MEMORANDUM OPINION

### INTRODUCTION

Before the Court are cross-motions for summary judgment requesting review of the decision to terminate long-term disability benefits.

Specifically, on March 11, 2013, Stephanie Schott Moros ("Plaintiff" or "Moros"), filed a motion for summary judgment challenging Connecticut General Life Insurance Company's ("Defendant" or "CGLIC") termination of her long-term disability benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a)(1)(B) ("ERISA"), and seeking the reinstatement of her benefits. Plaintiff's arguments are based on contentions that CGLIC: terminated benefits in the absence of meaningful evidence to support the termination; improperly required her to provide objective evidence of a subjective condition; improperly disregarded her treating physician's observations and opinions; improperly disregarded her award of Social Security disability benefits; and failed to comply with Section 503 of ERISA and its accompanying regulations.

On March 11, 2013, CGLIC filed a cross-motion for summary judgment contending that the termination of benefits was proper since Moros failed to submit satisfactory written medical evidence ("recent clinical evidence") indicating that she remained disabled from engaging in

"any occupation", as required under the applicable policy. In support of its termination action, CGLIC argues that it relied on several independent conclusions that Moros was capable of working; *to wit:* 1) Dr. Albert Fuchs' independent Peer Review Report, which was based on a detailed review of the entire medical record and suggested an alternative cause of Moros' disabling fatigue – deconditioning; 2) the Functional Capacity Evaluation ("FCE") results which indicate that Moros was capable of performing sedentary activity in an eight-hour workday; and 3) the Transferable Skills Analysis which identified jobs Moros could perform based on the FCE.

To resolve the arguments contained in these cross-motions for summary judgment, this Court considered the cross-motions for summary judgment [ECF 14, 16], the responses in opposition to the cross-motions for summary judgment [ECF 17, 19], Plaintiff's reply [ECF 26], Defendant's statement of undisputed facts [ECF 14-1], Plaintiff's response to Defendant's statement of undisputed facts [ECF 18], Plaintiff's complaint [ECF 1], Defendant's answer to the complaint [ECF 4], and all the attachments to the motions and pleadings.

After carefully considering the cross-motions for summary judgment, the administrative record, and applying a *de novo* standard of review, for the reasons stated below, this Court concludes that CGLIC improperly terminated Plaintiff's long-term disability benefits. Consequently, CGLIC's motion for summary judgment is denied and Moros' motion for summary judgment is granted, *in part*. Consistent with the discussion below, this matter is remanded to the plan administrator (a) to conduct a proper FCE study in accordance with the opinions expressed by Dr. Miller, Dr. Rosenberg, and Dr. Lopatin and, thereafter, (b) to determine whether Moros' benefits should be reinstated.

**LEGAL STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure (Rule) 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Only disputes over facts that are "material" that might affect the outcome of the case under governing law will properly preclude the entry of summary judgment. *Id.* "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial *Celotex* burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met its initial burden, the adverse non-moving party's response must support the assertion that a fact is genuinely disputed by: "(A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited [by the moving party] do not establish the absence or presence of a genuine dispute ...." Rule 56(c)(1). Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

Where cross-motions for summary judgment have been filed, each party essentially contends that no issue of material fact exists. Therefore, each motion for summary judgment is considered separately. *Mega Const. Corp. v. Quincy Mut. Fire Ins. Co.*, 2012 WL 3994473, at *4

3

(E.D. Pa. Sept. 12, 2012) (citing *Williams v. Phila. Housing Auth.,* 834 F. Supp. 794, 797 (E.D.

Pa. 1993) (citations omitted)). The standards under which a court grants or denies summary

judgment, however, do not change because cross-motions are filed. Each party still bears the

initial burden of establishing a lack of genuine issues of material fact. Such contradictory claims

do not necessarily guarantee that if one party's motion is rejected, the other party's motion must

be granted. *Id.*

## BACKGROUND

The administrative record is voluminous. The following is a summary of the relevant and

pertinent facts contained therein and argued in the cross-motions for summary judgment:

Moros was employed from May 22, 1994, until May 15, 1996, at Sun
Company, Inc.,[1] as a process engineer. She held a bachelor of science degree in
chemical engineering. As an employee of Sun Company, Moros was insured
under the company's long-term disability policy ("Policy") procured from and
administered by CGLIC. As the plan administrator, CGLIC managed claims
submitted to it under the Policy and provided disability payments to employees
who met and/or continued to meet the Policy's definition of disabled; *i.e.*:

You will be considered Totally Disabled, if because of an injury or
Sickness, you are unable to perform the essential duties of any
occupation for which you are or may reasonably become qualified
based on your education, training, or experience.

The Policy also provides that claimants (such as Plaintiff), must provide "written
proof of continued Total Disability" upon request, and the plan administrator has
the "right to examine any person for whom a claim is pending as often as it may
reasonably require."

### Initial Claim

On June 11, 1997, CGLIC approved Moros's application for long-term
disability benefits based on a medical diagnosis of systemic lupus erythematosus
and chronic fatigue syndrome.[2] These conditions manifested as severe hip pain

---

[1] Also referred to as Sun Refining and Marketing.

[2] Chronic fatigue syndrome ("CFS"), also known as immune dysfunction syndrome, is a condition of
prolonged and severe fatigue which is not relieved by rest and is not directly caused by other conditions.

related to trochanteric bursitis (inflammation in the hip), fevers, and overwhelming fatigue. A memo dated June 18, 1997, written by a claim representative of CGLIC, Mr. Brian Murray, noted that at the time, Plaintiff was totally disabled from all occupations. A Ms. Hagan concurred with the opinion. Plaintiff's treating physician has consistently been Mark Lopatin, M.D., a rheumatologist.

An administrative memorandum generated at CGLIC dated February 24, 1998, referenced CGLIC's interest in "follow[ing] along with [Moros'] progress". The memorandum noted that Moros expressed an interest in working from her home if she could manage her pain, but the evaluator felt, based on the medical information in the file, that she could return to a conventional occupation.[3] In response to this opinion, Dr. Lopatin submitted a report wherein he opined that Moros was not capable of returning to gainful employment, noting her restrictions and limitations, *i.e.*, that she could not sit, stand, or walk for any period of time due to pain and fatigue.

Consistent with the memorandum's stated monitoring objective, in May 1998, CGLIC ordered Moros to undergo a Transferable Skills Study ("TSS"), which was to consider Dr. Lopatin's opinion regarding her limited abilities. As a result of the testing, the occupational consultant opined that Moros could perform the following occupations: Quality Control Technician; Safety Inspector; Identification Clerk; Laboratory Clerk; and Dispatcher, Maintenance Service.

On July 3, 1998, in response to CGLIC's request, Dr. Lopatin submitted a completed *Physical Capacities* evaluation and additional information regarding Moros' disability, and reiterated his opinion that Moros remained unable to work,

---

The exact cause is unknown but viruses such as Epstein–Barr virus or human herpes virus–6 are suspected. It may also be caused by inflammation of pathways in the nervous system which generates a non-specific immune response or process or when a viral illness is complicated by a problem with the body's immune response. To be diagnosed with this condition, the new-onset fatigue must last at least 6 months, not be relieved by bed rest, and be severe enough to restrict the patient's exertion level to 50% or less of her typical exertion levels before the illness. Other medical signs of CFS include mild fever, sore throat, lymph node tenderness, widespread muscle weakness and muscle pain, unrefreshing sleep, headaches, joint pain (often migratory but without swelling or redness), and mental conditions such as forgetfulness, difficulty concentrating, confusion, or irritability. The Centers for Disease Control have identified CFS as a distinct disorder with specific symptoms and physical signs; it is diagnosed by ruling out other possible causes. *See* medical encyclopedia entry at MedlinePlus. Like fibromyalgia, there is no "dipstick" laboratory test for chronic fatigue syndrome; however, it has been recognized by the Centers for Disease Control since 1988 and the Social Security Administration's internal operations manual lists CFS as a disease to be adjudicated on a case-by-case basis. *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261, 270 n. 8 (W.D. Pa. 2008) (citing *Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 744 (10th Cir. 1993)).

[3] In August 1996, Moros contemplated returning to work, however, Sun Company required her to work a 10-hour day and was unable to accommodate her request to work eight hours. CGLIC-SF-00531.

even in a sedentary[4] capacity, and that she was unable to perform any of the above noted TSS occupations. Dr. Lopatin was critical of the Physical Capacities form, which indicated an ability to bend, crawl, kneel, weight bearing activities, moving head and neck, and so forth – stating that it was not an appropriate tool to measure disability based on excessive fatigue.

On July 24, 1998, the Social Security Administration ("SSA") awarded Moros disability benefits[5] effective as of May 16, 1996[6] (a day after Moros ceased employment at Sun Company).[7]

Moros remained on permanent disability status for approximately 10 years. On April 24, 2008, Moros, as requested, submitted to a Functional Capacity Evaluation ("FCE"), conducted by Linda Furey, a physical therapist, as part of a claim review. At the time, Plaintiff presented symptoms of her condition, including constant pain and tenderness in the right hip, a "hot" feeling in the right calf, intermittent numbness in the right foot (although no neurological deficits were noted), constant right sided rib/abdominal pain, nausea, shortness of breath, and frequent headaches. Moros expressed that she was able to perform activities of daily living, such as dressing, grooming, bathing, and hygiene, but was unable to perform house cleaning and yard work. In many of the activities performed during the FCE, objective signs of fatigue were observed, and other activities were stopped due to her complaints of pain. Ms. Furey concluded that Moros demonstrated limited abilities in the "Medium work classification" and stated that Moros was functionally capable of sedentary work on an eight-hour per day basis.

CGLIC retained Avrom Simon, M.D., M.P.H., an occupational medicine specialist, who conducted a peer review of Moros' file, which included the FCE results, video surveillances conducted on April 25-30, 2008, and medical records. Dr. Simon offered an opinion that Moros could "perform full-time sedentary work". Thereafter, Dr. Lopatin submitted letters dated May 26, 2008, and June 27, 2008, disagreeing with Dr. Simon's assessment and opining that Moros was disabled.

By letter dated October 15, 2008, CGLIC notified Moros that her long-term disability benefits were terminated based upon, *inter alia*, the FCE study and Dr. Simon's report.

---

[4] Sedentary work is defined by the Dictionary of Occupational Titles as "Lifting, Carrying, Pushing, Pulling 10 Lbs. occasionally. Mostly sitting, may involve standing or walking for brief periods of time." *See* http://www.onetonline.org; 3 Soc. Sec. Law & Prac. § 43:5; CGLIC-SF-01011.

[5] Moros was initially denied Social Security disability benefits on August 20, 1997.

[6] CGLIC paid the expenses incurred to obtain the medical records needed for the Social Security Disability Income ("SSDI") claim and, as the result of the government determination, reduced its monthly long-term disability benefit payment to Moros.

[7] Moros had been receiving medium-term disability benefits since December 11, 1996. *See* CGLIC-SF-00704.

*First Appeal*

Through the internal administrative process, Moros appealed CGLIC's decision and submitted additional reports from Dr. Lopatin, who again advised the plan administrator that he had been treating Moros for 13 years and that she was neither "malingering nor [ ] inventing symptoms for the purpose of obtaining disability". Dr. Lopatin confirmed that Moros has a "clearcut diagnosis" of lupus and chronic fatigue syndrome, both conditions which are deemed to be chronic and have no cure. Moros also submitted gastroenterology reports from various physicians, and an emergency room visit which chronicled Moros' intermittent right upper quadrant abdominal pain and her diagnosis.

As part of the appeal process, CGLIC referred Moros to Ronald L. Rosenberg, Ph.D., A.B.V.E., C.R.C., C.D.M.S., a Diplomat of the American Board of Vocational Experts, for a *Vocational and Disability Evaluation*. In a report dated July 16, 2009, Dr. Rosenberg remarked that Moros was an "accurate and credible informant", and disagreed with the conclusion that she could engage in full-time sedentary work. He disagreed that the FCE's findings relied upon were an indicator of a person's ability to perform reliably over the course of an eight-hour day, five days a week work schedule. Dr. Rosenberg's report also referenced the Social Security administrative law judge's finding that Moros "does not have even the residual functional capacity to perform a limited range of sedentary work" and thereby awarded her Social Security disability benefits.

CGLIC retained Linda Miller, M.D., to perform a record peer review from an internal medicine point of review. On September 21, 2009, Dr. Miller issued a 13-page report, wherein she agreed with Dr. Lopatin's opinion that Moros' diagnosis of systemic lupus erythematosus has no cure, and found that Dr. Lopatin's assessment of Moros' restrictions and limitations are supported in the documentation provided from October 15, 2008, through the time of her report. Dr. Miller likewise disapproved of the FCE performed in April 2008, noting that the resulting report failed to indicate the duration of Moros' evaluation. On this issue, Dr. Miller commented:

> For cases such as chronic fatigue, however, the functional capacity evaluation should be done over three days, eight hours per day, to compare how a person does from one day to the next in the performance of the same tasks to see if there is a decrease in performance on the second and third day as compared to the first. This would give a more accurate picture of the actual ability to do a work environment on a day-to-day basis for eight hours a day.

On January 14, 2010, CGLIC reinstated Moros' long-term disability benefits retroactive to November 16, 2009, the date her long-term disability benefits had been terminated.

7

*Second Claim*

On April 25, 2011, as requested and pursuant to the terms of the Policy, Moros completed another *Disability Questionnaire and Activities of Daily Living* form, and again reaffirmed her inability to work in any occupation due to "the unpredictable nature of [ ] fatigue and malaise and lupus flares". On June 6, 2011, Dr. Lopatin submitted a *Medical Request* form to CGLIC indicating that Moros suffered from "severe fatigue, recurrent abdominal pain, oral ulcers, occasional fever, arthralgias" and that the "unpredictability of [Moros'] fatigue [ ] precludes consistent employment".

On October 12, 2011, CLGIC issued an internal investigative report based on a suspicion that Moros was faking her disability. The report of the surveillance conducted September 16-18, 2011, and on November 28-30, 2011, indicated that during the times Moros was observed outside of her residence, she "appeared to perform [ ] activities in a fluid and unrestricted manner".

On November 29, 2011, Moros submitted to another FCE which lasted approximately two and a half hours and was performed by Kerri J. Yacovelli, a physical therapist. In her report, Ms. Yacovelli noted that Plaintiff described "feeling miserable", in "a lot of pain in different places", "beyond exhausted", and "flu like". Ms. Yacovelli further indicated that Moros was independent with the activities of daily living (dressing, grooming, and hygiene) but these proved "challenging". She noted that the FCE revealed results less favorable than those obtained in the April 2008 FCE, including elevated pain levels (previously noted as tolerated, albeit with some fatigue observed), decreased movement ability (such as decreased hip and trunk rotation with decreased cadence), decreased sensation in the extremities (whereas in April 2008, no neurological deficits were noted) and "increased overall fatigue at the end of the assessment". At the time of this FCE, Moros was on beta blockers which limit heart rate elevation, so an accurate aerobic capacity could not be determined. Moros demonstrated an ability to walk for 12 minutes. In light of these findings, Ms. Yacovelli concluded that Moros demonstrated an ability to work an eight-hour work day in a sedentary capacity.

On January 6, 2012, Randy Norris, M.S., C.R.C., C.C.M., a rehabilitation specialist, performed a Transferable Skills Analysis and concluded that, given the physical capabilities set out in the November FCE, the following occupations were within Moros' skills, educational attainment, work history, and wage requirement: personnel quality assurance auditor, home furnishings sales representative, and burial needs salesperson.

By letter dated January 10, 2012, CGLIC terminated Moros' long-term disability benefits effective February 11, 2012.

On April 3, 2012, Dr. Lopatin submitted a report indicating that he examined Moros on March 22, 2012, and that her health status had not changed

since her forms were completed in June 2011. He opined that she "continues to be disabled by her chronic fatigue". Dr. Lopatin also qualified that although fatigue is a "difficult if not impossible symptom to objectify, it has been a consistent complaint of [Plaintiff] for many years". He further opined that the "fluid and unrestricted manner" in which Moros ambulated while under video surveillance is irrelevant to the symptom of fatigue, which is her main limiting symptom. He stated that while Moros' fatigue does not preclude her from doing all activities, "it does prevent her from working a 40-hour work week on a regular basis". Finally, echoing Dr. Miller's recommendation, Dr. Lopatin reiterated that an FCE conducted for eight hours on several consecutive days would more accurately assess functional capacity and, hence, Moros' true ability to work on a regular basis.

### *Second Appeal*

On April 30, 2012, Moros filed an internal administrative appeal of the termination of her long-term disability benefits. On May 14, 2012, a nurse case manager reviewed Moros' claim, including her medical records, and concluded that the information provided did not change the decision. Thereafter, CGLIC retained Albert C. Fuchs, M.D., board certified in internal medicine, to conduct an independent peer review, considering the FCE results and her medical records. Dr. Fuchs was not provided a copy of Dr. Miller's September 21, 2009, report. On July 10, 2012, Dr. Fuchs issued a report which agreed with the November 2011 FCE summary and opined that Moros could return to work. He disagreed with Dr. Lopatin's opinion regarding Moros' inability to work, and stated that Dr. Lopatin's opinion was not supported by clinical data. Dr. Fuchs further noted:

> … [T]here is clinical data that other markers of the claimant's lupus have improved, suggesting that this is not the cause of her fatigue. The other markers of her chronic fatigue syndrome are also not documented to have worsened recently. This strongly suggests that her fatigue is not due to her lupus or chronic fatigue syndrome and is due to a non-medical problem, such as deconditioning.[8]

As for the video surveillances conducted, Dr. Fuchs opined that the footage was uninformative and that the activities observed were not dispositive of Moros' functional capacity.

By letter dated July 19, 2012, CGLIC denied Moros' appeal and affirmed the termination of her long-term disability benefits. In response to Moros' concerns, the letter also addressed the reasons for not accepting the Social Security Administration's determination of July 24, 2008, which awarded Moros disability benefits; *to wit*:

---

[8] Decrease of physiological adaptation to normal conditions, or, in other words, being "out of shape."

> [T]he standard for determining Disability under this Policy may be
> different from standards used by the [SSA]. As a fiduciary under
> [the Policy], we are required to make our determination based on
> the applicable provisions of the Policy and the proof of loss of
> information available. Without an opinion from SSA explaining
> the basis for its decision, we cannot evaluate its reasoning and so,
> can take note of its decision, but cannot rely on or otherwise
> promote that decision ahead of other proof of claim and policy
> information. We must make our determination independent of
> Social Security's determination and based upon the medical
> information provided and the specific Policy provision
> requirements [thereunder].

On September 25, 2012, Moros filed the instant complaint appealing the termination of

her long-term disability benefits.

## DISCUSSION

This Court will address the numerous issues presented in the cross-motions for summary

judgment in a joint fashion, since the arguments are intertwined.

### *ERISA Standard of Review*

The provisions of ERISA provide that a plan participant may bring a civil action either to

recover benefits due under the terms of the plan, to enforce rights under the terms of the plan, or

to clarify rights to future benefits under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B); *Adams*

*v. Life Ins. Co. of N. Am.*, 2009 U.S. Dist. LEXIS 68135, at *11 (E.D. Pa. Aug. 3, 2009). A

denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard

of review unless the benefit plan gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber*

*Co. v. Bruch,* 489 U.S. 101, 115 (1989). Here, the parties seek a *de novo* review of the

termination of Moros' long-term disability benefits,[9] and for the reasons expressed below, this Court agrees.

Under the *de novo* standard of review, the role of the court is to review the record and determine whether the administrator properly interpreted the plan and made the correct decision, and whether the insured was entitled to benefits under the plan. *Heim v. Life Ins. Co. of N. Amer.*, 2012 U.S. Dist. LEXIS 38257, at *19 (E.D. Pa. Mar. 21, 2012) (citing *Viera v. Life Ins. Co. of N. Amer.*, 642 F. 3d 407, 413-414 (3d Cir. 2011)). *See also White v. Prudential Ins. Co. of Am.*, 908 F. Supp. 2d 618, 625 n. 9 (E.D. Pa. Nov. 9, 2012) ("When a de novo standard of review is applied to an administrative record … the Court resolves disputes of material fact, and is not required to view the evidence in the light most favorable to the nonmoving party, as required under Rule 56.") (citing *MacFarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 271 (3d Cir. 2012) (citation omitted)).

In instances where a benefit plan gives the administrator or fiduciary the requisite discretionary authority, a court must apply the deferential arbitrary and capricious standard of review. *See Howley v. Mellon Financial Corp.*, 625 F. 3d 788, 792 (3d Cir. 2010). The "arbitrary and capricious" standard is essentially the "abuse of discretion" standard. *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 n. 4 (3d Cir. 1993) (citations omitted). Under the arbitrary and capricious (abuse of discretion) standard of review, the district court may overturn a decision of the plan administrator only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* (footnote and citations omitted).

"Whether a plan administrator's exercise of power is mandatory or discretionary depends upon the terms of the plan." *Adams*, 2009 U.S. Dist. LEXIS 68135, at *14 (quoting *Luby v.*

---

[9] In her submission, however, Moros also argues that the termination of benefits was an arbitrary and capricious abuse of discretion by the plan administrator. In light of this Court's determination that a *de novo* review is appropriate, this argument is deemed irrelevant and, therefore, moot.

*Teamsters Health, Welfare, and Pension Trust Funds*, 944 F.2d 1176, 1180 (3d Cir. 1991)). The terms of the plan/policy are construed "without deferring to either party's interpretation." *Luby*, 944 F.2d at 1180 (citing *Firestone*, 489 U.S. at 112). "There are no 'magic words' that grant discretion to the administrator – discretion may be granted implicitly or explicitly – however, when a plan is ambiguous, its terms are construed in favor of the insured." *Viera*, 642 F.3d at 413 (citations omitted); *McKinnis v. Hartford Life*, 2009 WL 1444429, at *3 (E.D. Pa. May 22, 2009) (citing *Farina v. Temple Univ. Health Sys. Long Term Disability Plan*, 2009 WL 1172705, at *10 (E.D. Pa. Apr. 28, 2009)).

To determine the proper standard of review, this Court considered the description of the Sun Company Summary Plan and the Policy, which provide, respectively:

> If your disability continues, from time to time you will be required to furnish *evidence of your disability*.[10]

> CG[LIC] will begin paying Monthly Benefits in amounts determined from The Schedule when it receives *due proof* that: -- you became Totally Disabled while insured for this Long Term Disability Insurance ....[11]

Federal courts in this district have not conclusively determined whether language similar to the *due proof* (*e.g.*, "satisfactory proof") language confers "discretion" to a plan administrator so as to warrant an arbitrary and capricious standard of review of a termination decision. *See Farina*, 2009 WL 1172705, at *10 (holding that it is unclear whether a plan that requires an insured to submit 'satisfactory proof' to the claim administrator confers sufficient discretion upon the administrator to warrant arbitrary and capricious review). However, "the weight of recent authority indicates that a plan term requiring a claimant to support his claim with satisfactory proof, absent more, fails to confer discretion upon an administrator." *Id. See also Adams*, 2009 U.S. Dist. LEXIS 68135, at *19 ("satisfactory proof" would not convey

---

[10] Pa 134 (emphasis added).
[11] Pa 169; CGLIC-SF-01713 (emphasis added).

discretionary authority to determine whether the plaintiff was disabled and applied the *de novo* standard).

Likewise, in other districts, courts have concluded that the "due proof" requirement does not grant discretionary authority upon a plan administrator warranting a *de novo* standard of review. *See Hersee v. First Allmerica Financial Life Ins. Co.,* 2002 U.S. Dist. LEXIS 7110, at *8 (D. Mass. 2002) (finding that the policy at issue merely set forth the mechanics of applying for and receiving benefits and, thus, did not sufficiently provide the administrator with discretionary authority; the court reviewed the matter under the *de novo* standard of review); *Ellis v. Egghead Software STD and LTD Plans,* 64 F. Supp. 2d 980, 983 (E.D. Wash. 1999) (long-term disability plan determination was reviewed *de novo* as "due written proof of loss" language did not confer discretion).

Under ERISA § 1132(a)(1)(B), the *de novo* standard of review applies regardless of whether the plan at issue is funded or unfunded, and whether the administrator or fiduciary is operating under a possible or actual conflict of interest. *See Firestone*, 489 U.S. at 115.

Based upon this Court's interpretation of the case law cited and the terms of the Policy, a *de novo* standard of review is warranted. This Court will review *only* the record and the decision to terminate Moros' long-term disability benefits; and will not analyze the types of benefits plans or perceived conflicts of interest, nor focus on the motivations, if any, of the plan administrators and its fiduciaries, nor weigh factors or determine whether CGLIC'S decision was reasonable, as herein urged by the parties. These factors apply primarily to an abuse of discretion review, not applicable in this matter.

### *Scope of Evidence Reviewed*

When performing the *de novo* review, this Court considered the administrative record,[12] the pleadings, and the exhibits submitted in support of the respective motions for summary judgment, which included CGLIC's Summary Plan Description, attached as an exhibit to Plaintiff's motion for summary judgment. CGLIC contends that said exhibit does not form part of the administrative record,[13] and should not be considered.[14]

The Third Circuit permits a court to base its *de novo* review on "any information before the administrator initially, as well as any supplemental evidence[.]" *Viera v. Life Ins. Co. of N. Amer.*, 871 F. Supp. 2d 379, 384 (E.D. Pa. May 15, 2012) (citing *Viera*, 642 F.3d at 418). Thus, it is within the discretion of the court to expand the record as needed or to proceed on the basis of the previously developed record. *Id. See also Luby*, 944 F.2d at 1184 (limiting the scope is "contrary to the concept of *de novo* review") (citing *Moon v. American Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir. 1989)). A *de novo* review essentially means that the court's inquiry is not limited to or constricted by the record, nor is any deference due to the party's interpretations of the plan or to the conclusion under review. *Id.* (citing *Doe v. United States*, 821 F.2d 694, 697 (D.C. Cir. 1987) (noting that for the review of administrative decisions, "the reviewing court is not confined to the ... record, but may pursue whatever further inquiry it finds necessary or proper to the exercise of the court's independent judgment." *Id.* at 698 n. 9 (treatise citation omitted)).

---

[12] While Moros' entire administrative record has been reviewed, this Court focuses its discussion on what has been referred to as Moros' second claim and appeal (April 25, 2011), and the reasons for terminating her benefits at that time.

[13] *See* Defendant's Brief in Opp. at 2-3 [ECF 19]; *see also* Pa 126-162.

[14] Notwithstanding this objection, the official record (docket) does not reflect that CGLIC filed a motion to strike this document, which is the proper remedy to contest documents that are allegedly not part of or are outside of the administrative record. *See Babish v. Sedgwick Claims Mgmt. Servs.*, 2009 U.S. Dist. LEXIS 18594, at *12-13 (W.D. Pa. Mar. 2, 2009). For the reasons stated, this objection is overruled.

Consequently, this Court concludes that it is not limited only to reviewing the evidence before CGLIC when it made its final termination decision, but will also consider CGLIC's Summary Plan Description, to determine this Court's scope of review.

### FCE and Other Objective Measures of a Subjective Condition

As stated, CGLIC determined that Moros was totally disabled from all occupations based upon diagnoses of systemic lupus erythematosus and chronic fatigue syndrome from June 1997 until February 2012, when it terminated her long-term disability benefits a second time. As mentioned in the background exposé, the first time Moros' disability benefits were terminated was November 16, 2009, and after an administrative internal appeal, these benefits were reinstated on January 4, 2010, retroactively. Fifteen months later, CGLIC commenced another claim review of Moros' disability status.

It is well-established in ERISA (and Social Security disability) cases that chronic fatigue syndrome, like fibromyalgia, is a condition for which there are no objective clinical tests, such as blood or other laboratory tests, x-rays, or MRIs, to confirm the diagnosis. *See Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261, 299 (W.D. Pa. 2008). "Because objective tests may not be able to verify a diagnosis of fibromyalgia, the reports of treating physicians, as well as the testimony of the claimant, become even more important in the calculus for making a disability determination". *Perl v. Barnhart,* 2005 WL 579879, at *3 (E.D. Pa. Mar. 10, 2005). To require 'objective' medical evidence to establish the etiology of chronic fatigue syndrome, defined by the absence of objective medical evidence, creates an impossible hurdle for claimants and is arbitrary and capricious under the heightened standard we apply in this case. *See Lemaire v. Hartford Life and Acc. Ins. Co.,* 69 Fed. Appx. 88, 93 (3d Cir. 2003) (citing *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 442-443 (3d Cir. 1997)). Even where an ERISA

15

administrator imposed a requirement for "objective" medical evidence not explicit in a plan's terms, it would be unreasonable to do so in the case of a fibromyalgia patient because such a requirement would effectively preclude any such patient from qualifying as totally disabled. *See Brown v. Continental Casualty Company,* 348 F. Supp. 2d 358, 369 (E.D. Pa. Sept. 10, 2004).

While the amount of fatigue or pain an individual experiences may be entirely subjective, however, the extent to which those conditions limit a person's functional capabilities can be objectively measured. *Lamanna*, at 296; *see also Williams v. Aetna Life Ins. Co.,* 509 F.3d 317, 322 (7th Cir. 2007); *Boardman v. Prudential Insurance Co. of America,* 337 F.3d 9, 16 n. 5 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."). Generally, the functional capacity evaluation ("FCE") is an objective measure of a person's physical limitations.

Here, the record shows that during her disability, Moros underwent at least four FCEs, although the record includes only copies of the April 24, 2008, and November 29, 2011, FCE results.[15] Dr. Lopatin, Moros' treating physician, and Dr. Miller, CGLIC's initial independent medical expert, were critical of the April 2008 FCE study's conclusions. Specifically, Dr. Miller wrote that for the evaluation to be effective the FCE should be done over three days, eight hours per day, to compare how a person does from one day to the next in the performance of the same tasks to determine the performance on the second and third days as compared to the first. Both doctors opined that a one-day test did not present a true picture of an illness characterized by variable and, in many cases, unpredictable symptoms. *See Brown*, 348 F. Supp. 2d at 367. In general, both physicians opined that the limited testing did not indicate if a claimant, such as Moros, could realistically work a conventional eight-hour day, five days a week. As recognized

---

[15] The other two studies are mentioned in passing and no information could be found as to their results.

by the court in *Brown*, an *overall pattern* of illness must be considered, not just the abilities as measured on any particular day (or several-hour time span). *Id.*, 348 F. Supp. at 367 (emphasis added).

In Moros' administrative claim file, there are opinions critical of the manner in which the FCE was conducted and that it neither proves nor disproves claims of disabling pain, because it is merely a test of strength during the specific evaluation period. For example:

- Dr. Lopatin, Moros' treating rheumatologist for over 13 years opined in several

  reports:

"Unfortunately, functional capacities only reflect a [patient's] ability to function on a given day and do not measure the ability of a patient to function on a regular basis, 8 hours/day, 5 days a week."[16] And in regard to objective tests: "It should not be assumed that the symptom is not serious just because the tests are negative. MRI's and x-rays do not measure the level of pain ... There is no objective test that can define fatigue."[17]

- Dr. Rosenberg, from the July 16, 2009, Vocational and Disability Evaluation

  requested by CGLIC:

"The methodology of utilizing a time-limited Functional Capacity Evaluation to determine employability and/or being able to work has been criticized in the literature and is a source of controversy ... In the instance of Ms. Moros, her medical conditions of Lupus, Chronic Fatigue Syndrome, and the range of other problems do not constitute a steady state of functioning that can be measured at one juncture with the assumption that those results would then predict how she would function in a regular and consistent manner." In support of this opinion, Dr. Rosenberg quotes an article published contemporaneous with his opinion:

> [T]he attempt to extrapolate data from a 1- to 2-hour assessment to an 8-hour work day is a major conceptual error in the design of some FCEs.[18]

---

[16] June 27, 2008, letter disagreeing with assessment after FCE report dated April 24, 2008. CGLIC-SF-00974.

[17] June 29, 2009, letter addressing underlying condition and disability status. Pa 41.

[18] Reneman, M., Wittink, H., and Gross, D.P. (2009). "The Scientific Status of Functional Capacity Evaluation." In Genovese, E. and Galper, J.S. (Eds, 2009). Guide to the Evaluation of Functional Ability. Chicago, Il: American Medical Association (emphases omitted). Pa 54; CGLIC-SF-00743.

- Dr. Miller, retained by CGLIC to perform a medical peer review as part of Moros'

  first appeal:

"The claimant had a functional capacity evaluation in April 2008 stating she was capable of doing a sedentary occupation. The report however does not state how long the claimant was there for the evaluation. Most of these evaluations are done over three to four hours and the information is then used to predict what a person would be able to do in an eight hour work day. For cases such as chronic fatigue, however, the functional capacity evaluations should be done over three days, eight hours per day, to compare how a person does from one day to the next in the performance of the same tasks to see if there is a decrease in performance on the second and third day as compared to the first. This would give a more accurate picture of the actual ability to do a work environment on a day-to-day basis ...."

To be thorough, this Court also notes that the administrative record contains opinions that

unequivocally rely on the FCE results:

- An internal note generated on March 24, 2008:

"File referred for an exploratory [Transferable Skills Analysis] in order to provide vocational direction to the [Claim Manager] about the impact an FCE would have on determining the [Plaintiff's] ability to do other occupations."

- Dr. Simon's August 28, 2008, peer review report:

"Despite complaints the [FCE] exam findings and diagnostic imaging do not reveal significant pathology and certainly no pathological condition that precludes working. The exam findings do not document weakness, range of motion deficits, or gait disturbance.

* * *

"The available clinical exam findings would suggest that the patient should be able to engage in more than just basic activities of daily living.

* * *

"The FCE indicates that the patient can perform full time sedentary work which is consistent with the available clinical data provided for review."

- During the second appeal process, an Action Plan/Investigation Results entry

  made on July 18, 2012, reflects:

"Ryan Smith 05/30/2012, AS received IM PR which indicates [Plaintiff's] off work status is not supported from 2/12/12 forward based on the below rational,

18

PR indicates [restrictions and limitations] identified on FCE dated 11/29/11 are supported by the available medical documentation therefore AS recommends Affirmation. RS 7/18/12."

- From Dr. Fuchs' July 10, 2012, report:

"I agree with the restrictions and limitations identified in the functional capacity evaluation. The [FCE] on 11/29/11 found that the claimant can sit frequently, and stand, walk and climb stairs occasionally. This evaluation also found that she cannot kneel, crouch, or crawl. The limitations listed in the [FCE], precluding kneeling, crouching, and crawling is reasonable given the claimant's systemic lupus with joint manifestations.

Assessing the reliability and biases of the opinions offered, especially those opinions regarding the FCEs and the reliance thereon to form further opinions regarding Moros' ability to engage in any occupation, this Court concludes that CGLIC unjustifiably ignored its own experts', Drs. Miller and Rosenberg, previous specific recommendations that the FCE study be conducted over an extended period of time to properly evaluate Moros' ability to engage in any occupation. The absence of such an FCE study that realistically accounted for Moros' diagnoses, limitations and disability, thereby, providing an accurate gauge of her ability to work a typical work day, instead of the two-hour study CGLIC almost exclusively relied on, clearly affected CGLIC's ability to objectively evaluate Moros' situation and determine whether she remained disabled under the terms of its Policy. CGLIC's decision to terminate benefits was based on faulty conclusions and was, therefore, in error.

### Objective Evidence Required

In her motion for summary judgment, Moros also argues that CGLIC improperly required her to provide objective evidence of a subjective condition, an argument refuted by CGLIC. As noted, the Plan provides that a claimant may be required to furnish *evidence of disability* and that the Plan will pay benefits when it receives *due proof* of total disability. There is no provision in the Plan that requires Moros to provide clinical evidence of the etiology of the condition that

renders her disabled. *See Mitchell,* 113 F.3d at 443. CGLIC denies requiring such objective evidence of her disability.

A careful review, however, reveals that the record is replete with instances where CGLIC did, *in fact*, seek objective evidence of Moros' chronic fatigue syndrome on which to base its decision whether to continue or terminate her long-term disability benefits. As examples: in a May 23, 2008, letter to Dr. Lopatin regarding Moros' ability to engage in sedentary work, CGLIC informs him that "it must be *medically substantiated* that she is totally disabled from performing in Any Occupation, not just in her former occupation as a Tech Service Engineer for Sun Oil"; an October 7, 2008, CGLIC Claim Direction Staffing Form indicates that according to the occupational medical peer review, "[t]he available data in this file supports that the patient is able to return to full time, any work, of a sedentary nature. No *objective picture* of why this patient is unable to perform full time sedentary work. [Handwritten]: Denial"; an April 8, 2009, CGLIC Claim Direction Staffing Form states: "[t]he medical records from Dr. Lopatin do not provide any *clinically measured* findings that refutes the prior decision regarding functionality"; an April 27, 2009, assessment from CGLIC-retained Scott Taylor, D.O.: "…the medical records reviewed do not provide documentation of functional deficits by *clinical measurable testing* such as validated [range of motion] or strength measurements to support restrictions indicated by the treating physician from 10/15/08 forward".

More pertinent, an October 12, 2011, investigative report and a December 14, 2011, referral to Special Investigations indicate "[t]he claimant says she is unable to work in any capacity due to chronic fatigue, malaise and joint pain which affects her ability to do things as simple as showering and food shopping. The following red flags were noted: medical condition

has lingered beyond normal recovery time ... no *objective testing* by doctor, only subjective complaints; claimant is caregiver of 3 children."

Clearly, the record exposes CGLIC's requests for objective evidence of Moros' chronic fatigue syndrome, a subjective and incurable condition. These exemplars contradict CGLIC's argument. This Court finds that it was wholly improper for the Administrator to require Moros to provide clinical objective data of her chronic condition, for which no objective data is possible.

### *Surveillance Reports*

As part of its claim review process, CGLIC ordered that surveillance be done to assess Moros' disability. While the ordering of surveillance is an aggressive tactic, nothing prohibits its use. *See Post v. Hartford Ins. Co.*, 501 F.3d 154, 166-67 (3d Cir. 2007). On the contrary, this Court recognizes that surveillance may at times be necessary to verify if a claimant is feigning a disability.

From the record, it appears that surveillance was conducted on three occasions (once before the first denial and reinstatement of benefits, and twice after the second denial of benefits), and each time the surveillance period lasted three days. During two surveillance periods, Moros was observed outside of her home on only one of three days, and during one surveillance period, she was observed outside of her home on two days. The report notes that each time Moros was observed outside of her home she exhibited physical capabilities of daily living (walking, entering/exiting her vehicle, driving) without any major issue. Two surveillance periods coincided with Moros attending an FCE appointment. After the November 2011 FCE, the surveillance report indicated that Moros was observed to be lethargic.

Dr. Fuchs, CGLIC's retained medical expert, opined that the surveillance videos of Moros obtained in September and November 2011, were uninformative and not dispositive of the

severity of Moros' disability to perform full-time work. This Court finds no reason in the record to reject this opinion. As such, this Court accepts that the surveillance reports offer no evidence on the issue of whether Moros is able or unable to perform any sustained occupation.

### *Evaluations and Opinions Considered by CGLIC*

Pursuant to the Policy's requirements and throughout Moros' claim, Dr. Lopatin was required to submit medical documentation to CGLIC, which included, *inter alia*, physician's statements, office visit notes, medical report statements, letter correspondence, supplementary claim disability benefits forms, medical records, and physical capacities forms. These submissions show that from June 1996 to June 2011, Dr. Lopatin, as Moros' treating physician, examined her for physical manifestations of lupus and chronic fatigue syndrome, conditions that varied; *i.e.*, in some visits Moros reported an alleviation of symptoms due to the cessation or administration of certain medications, while other visits revealed an increase in and/or intermittent signs of pain and discomfort. Consistently throughout this claim, however, Dr. Lopatin resolutely opined that Moros was unable to work, even when she considered returning to work shortly after she was initially diagnosed. Dr. Lopatin remained involved in both of Moros' administrative appeals, each time disagreeing with CGLIC's conclusions and of several retained experts, that Moros was able to perform sedentary work. In his oppositions, Dr. Lopatin explained the reasons for not being able to rely on the evaluations used to determine Moros' functional capabilities (*i.e.*, the FCEs).

In general, courts are not required to credit or defer to the treating physician's opinions regarding disability. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (holding that plan administrators are not obliged to accord special weight to the opinions of treating physicians). However, "where a disease cannot be verified by objective tests, courts have

22

found that 'the reports of treating physicians, as well as the testimony of the claimant, become even more important in the calculus for making a disability determination.'" *Heim*, 2012 U.S. Dist. LEXIS, 38257, at *29 (citing *Perl*, 2005 U.S. Dist. LEXIS 3776, at *11 (where the Court evaluated denial of an appeal involving the denial of disability benefits where plaintiff suffered from fibromyalgia)). "[D]irect contact with a patient over an extended period of time seems especially important for reliable evaluation of a disease as subjective and variable as fibromyalgia, since it can allow more thorough examination of the patient's credibility and true range of abilities." *Brown*, 348 F. Supp. 2d at 368. *See also Lamanna*, 546 F. Supp. 2d at 299 (correlating chronic fatigue to fibromyalgia) (citing *Perl*, 2005 WL 579879, at *3). While plan administrators are not required by ERISA to perform any particular physical examinations, or, in fact, any physical examination at all, *Lamanna*, 546 F. Supp. 2d at 296, courts must still consider the circumstances that surround an administrator ordering a paper review. *Post*, 501 F.3d at 166.

Here, Dr. Lopatin has been treating Moros since at least 1996 and has consistently opined that she is totally disabled. He has also stated that, in his opinion, she is not a malingerer. This Court notes that CGLIC ordered additional evaluations and document peer reviews, despite and perhaps to justify disclaimers to Dr. Lopatin's medical opinion that Moros could not return to work. As examples: in May 1998, when Dr. Lopatin did not release Moros to work, CGLIC determined that the physical capabilities form he completed (and later criticized as being a poor measure of fatigue) indicated an ability to perform light duty and ordered a Transferable Skills Analysis in July 2008; when Dr. Lopatin disagreed with the April 2008 FCE and the Transferable Skills Analysis study, a peer medical review was ordered; and in June 2011, when Dr. Lopatin opined that Moros would never be able to return to work, CGLIC referred Moros' claim for two video surveillance investigations. Although CGLIC, as the plan administrator,

must satisfy itself with whether a claimant is truly disabled, the extent to which CGLIC pursued its investigation of Moros' disability, notwithstanding her treating physician's consistent opinions, raises a question as to whether these measures lead to an appropriate decision to terminate Moros' long-term disability benefits. More so, when Moros' physical conditions did not show any signs of improvement following the 15 months between her reinstatement of benefits and the second termination of benefits. At most, Dr. Fuchs opined, without elaboration, that "other markers" of Moros' lupus had improved, but that also "other markers" of her chronic fatigue syndrome had not worsened, and attributed her fatigue to "deconditioning".

In its decision to terminate benefits, CGLIC primarily relied on the November 29, 2011, FCE findings which, ironically, showed *poorer* results than the April 2008 FCE, and reflected elevated pain levels, decreased movement ability, and "increased overall fatigue at the end of the [two and a half hour] assessment". This increased fatigue was indirectly corroborated by the unsuspected surveillance which, in the report, noted that Moros "appeared to be lethargic after leaving the FCE". Notwithstanding the "poorer results" in this later study, the FCE consultant concluded that Moros could engage in an eight-hour work day. This opinion indirectly contradicts the previous finding of disability which had been based on "better" FCE findings.

In this Court's assessment, CGLIC, as plan administrator, ignored the FCE's "poorer results" as well as the additional and updated office visit notes, cardiology reports, rheumatology notes and lab results, all of which confirmed chronic conditions which had not changed from the previous decision which reinstated Moros' disability benefits. Even Dr. Fuchs opined, after reviewing all of the relevant medical records, that Moros' status had not significantly changed. It is highly questionable why Dr. Fuchs' review of the administrative record lacked Dr. Miller's report wherein she agreed with Dr. Lopatin's ongoing assessment of Moros and which criticized

the accuracy of a short-duration FCE. "[W]here the insured's treating physician's disability opinion is unequivocal and based on a long-term physician-patient relationship, reliance on a non-examining physician's opinion premised on a records review alone is suspect and suggests that the insurer is looking for a reason to deny benefits." *Morgan v. Prudential Ins. Co. of Am.*, 755 F. Supp. 2d 639, 647 (E.D. Pa. 2010) (absence of an examination is a factor in analyzing the differences in the opinions of the consultant and the treating physician) (citing *Kaufmann v. Metro. Life Ins. Co.*, 658 F. Supp. 2d 643, 650 (E. D. Pa. Sept. 24, 2009)). This Court agrees with the applicability of the holding in *Morgan,* in this case.

### *Social Security Disability Award*

In her motion, Moros further argues that in 1997, she was awarded Social Security disability benefits, retroactive to her last day of employment, based upon the diagnoses of lupus and chronic fatigue syndrome. She argues that the effect of this benefit award is that she was found to be disabled from any gainful employment; *i.e.*, from "any occupation".

In affirming the termination of benefits, CGLIC's letter mentioned that it lacked a copy of the opinion from the Social Security disability award decision and could not evaluate the agency's reason for the award. Moros points out, however, that CGLIC had initially encouraged her to apply for Social Security benefits, paid the attorney's fees, and benefited from the set off of the award when paying Moros' monthly benefits for over a decade. Regardless, CGLIC retorts that it is required to make its own determination of disability independent of the Social Security Administration's determination.

Certainly, employers have large leeway to design disability and other welfare plans as they see fit. In determining entitlement to Social Security benefits, a claimant's condition is measured against a uniform set of federal criteria. "[T]he validity of a claim to benefits under an

ERISA plan," on the other hand, "is likely to turn," in large part, "on the interpretation of terms in the plan at issue." *Firestone,* 489 U.S. at 115.

This Court agrees with the principle that CGLIC has no obligation to weigh the Social Security determination more favorably than other evidence, nor follow such determination. However, its plea of ignorance of the award and the opinions rendered affects its credibility and the legitimacy of its decision to terminate Moros' long-term disability benefits. Whether consideration of the existence of Social Security disability benefits is a relevant although not dispositive factor, is still an issue for the courts. *See Glenn v. Metlife (Metro. Life Ins. Co.),* 461 F.3d 660, 669 (6th Cir. 2006). In this Court's opinion, an ERISA plan administrator's failure to address the Social Security Administration's finding that the claimant was 'totally disabled' is yet another factor to consider in assessing the record. *See Dorsey v. Provident Life & Accident Ins. Co.,* 167 F. Supp. 2d 846, 856 n. 11 (E.D.Pa. 2001). A disagreement between the administrator and Social Security is relevant though not dispositive, when the administrator rejects the very diagnoses on which the Social Security Administration benefits determination is based, *Post,* 501 F.3d at 167, but had regarded in previously reinstating benefits.

This Court does not doubt that CGLIC considered Moros' long-term disability benefits award according to the Policy, and its right to review a claim. However, this Court is concerned over the facts that CGLIC was confronted with inconsistent opinions and evaluations when it first terminated benefits, which later resulted in the reinstatement of Moros' long-term benefits in 2010, and, 15 months later, it again terminated her benefits without any credible evidence showing either an improvement in her condition or an ability that she could realistically engage in any occupation, as required. This unsupported termination action creates a genuine dispute of

26

material fact that precludes entry of summary judgment for CGLIC, and further renders its decision to terminate benefits erroneous and unreasonable.

### *§ 503 Argument*

Moros also claims that CGLIC failed to comply with § 503 of ERISA, which requires that every employee benefit plan must:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C.A. § 1133.

These elements comprise the basic requirements governing ERISA plans. A plan that does not satisfy the minimum procedural requirements of § 503 and its regulations operates in violation of ERISA. *Miller v. American Airlines, Inc.*, 632 F. 3d 837, 851 (3d Cir. 2011).

CGLIC's January 10, 2012, letter outlined in sufficient detail and in plain language the reasons for its decision to terminate Moros' long-term disability benefits, as well as the steps to take to appeal the administrator's decision. Under the circumstances, this Court finds that CGLIC complied with § 503 of ERISA and, therefore, Plaintiff's argument is without merit.

### *Remedies*

Having addressed the cross-motions for summary judgment, it is the discretion of this Court to either remand the case to CGLIC for a renewed evaluation or to award retroactive benefits. *Heim*, 2012 U.S. Dist. LEXIS 38257, at *39 (citing *e.g. Kaelin v. Tenet Emple. Benefit Plan*, 2006 U.S. Dist. LEXIS 57433, at *10 (E.D. Pa. Aug. 16, 2006)). In deciding whether to remand to the plan administrator or reinstate benefits, it is important to consider the status quo

prior to impermissible termination of benefits. *Miller*, 632 F. 3d, at 856 (citing *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 776 (7th Cir. 2003)).

Based upon a careful review of the administrative record and pleadings, and applying a *de novo* standard of review, this Court is persuaded that CGLIC's termination of Moros' long-term disability benefits is highly questionable, incorrect, and not supported by the record. The November 2011 FCE, the primary evaluation relied upon in terminating Moros' long-term disability benefits was, in this Court's estimation, not properly conducted and did not realistically measure Moros' abilities to engage in any occupation for an eight-hour workday. This Court is convinced that if Moros' functional capacity was to be properly evaluated she would have an opportunity to support her claim for long-term disability benefits. On the other hand, a properly conducted FCE could find that she is able to engage in an occupation and is, therefore, not disabled.

**CONCLUSION**

For the reasons stated, Defendant's motion for summary judgment is denied, and Plaintiff's motion for summary judgment is granted, *in part*. This matter is remanded and CGLIC is directed to conduct a functional capacity evaluation consistent with the recommendations of Dr. Miller. If warranted, the study results should be referred to the appropriate consulting experts for a complete peer review and assessment. Plaintiff is to submit to this evaluation, which is to be performed at a mutually agreed upon date within the next 90 days. An appropriate Order follows.

Nitza I. Quiñones Alejandro, J.

28